# EXHIBIT 1

1  UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF CALIFORNIA,
2  SAN FRANCISCO DIVISION
   ---------------------------------------- X
3  ARIA DIAGNOSTICS, INC.,
                              Plaintiff
4       vs.

5  SEQUENOM, INC.,
                              Defendant.
6
   Case No.: 3:11-cv-06391SI
7  ---------------------------------------- X
   SEQUENOM, INC.,
8                        Counterclaim Plaintiff,
        vs.
9
   ARIA DIAGNOSTICS, INC.,
10
                        Counterclaim Defendant,
11      and

12 ISIS INNOVATION LIMITED,
                        Nominal Counterclaim
13                      Defendant.
   ---------------------------------------- X
14
                        1800 Avenue of the Stars
15                      Los Angeles, California

16                      May 23, 2012
                        9:22 a.m.
17

18      VIDEOTAPED DEPOSITION OF JOHN R. STUELPNAGEL, DVM,

19 taken by the Defendants, commencing at the hour of

20 before Lynette Marie Nelson, Certified Shorthand

21 Reporter in and for the State of California.

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                    Ref:  100613

1                    P R O C E E D I N G S

08:44:22  2              THE VIDEOGRAPHER:  Good morning.  The time on

09:22:18  3      the record is 9:22 a.m.  Today's date is May the 23rd,

09:22:22  4      2012.

09:22:23  5              My name is Javan Heard, contracted by Ellen

09:22:28  6      Grauer Court Reporting.

09:22:29  7              The court reporter today is Lynette Nelson,

09:22:30  8      also contracted by Ellen Grauer Court Reporting, located

09:22:35  9      at 126 East 56th Street, New York, New York 10022.

09:22:41 10              This begins the videotaped deposition of

09:22:43 11      Dr. John Stuelpnagel -- Stuelpnagel -- excuse me --

09:22:50 12      testifying in the matter of Aria Diagnostics, Inc.

09:22:54 13      versus Sequenom, Inc.  Counterclaim Sequenom versus

09:22:58 14      Aria Diagnostics et al.  Held in the United States

09:23:01 15      District Court, Northern District of California,

09:23:04 16      San Francisco Division, Case No. 311-CV-06391-S1 taken

09:23:13 17      at 1800 Avenue of the Stars, Los Angeles, California.

09:23:17 18              The video and audio recordings will take place

09:23:20 19      at all times during this deposition unless all counsel

09:23:23 20      agree to go off the record.  The beginning and end of

09:23:26 21      each media will be announced.

09:23:29 22              Will counsel please identify yourselves and

09:23:31 23      state whom you represent.

09:23:32 24              MR. ROTTER:  This is Jonathan Rotter for

09:23:34 25      Sequenom.  With me is Alicia Clough and Steve Holmes.

**STUELPNAGEL**

1

10:34:59  2   A.   There are multiple sources: the first that

10:35:02  3   comes to mind is our extensive clinical trial processes.

10:35:08  4   We have more clinical trials and more patients in our

10:35:15  5   clinical trials than any of our competitors.  And so we

10:35:19  6   believe we are validating our test more extensively than

10:35:26  7   our competitors.  We have also, through those, developed

10:35:29  8   good relationships for those clinical sites that might

10:35:36  9   become our customers.

10:35:38 10        In addition, we think we provide the most

10:35:41 11   informative result.  That whereas our competitors only

10:35:46 12   provide a quantitative yes/no, positive/negative answer,

10:35:53 13   we think we more appropriately provide both a

10:35:56 14   qualitative answer, in our case, we classify that as low

10:36:00 15   risk or high risk, as well as a quantitative answer,

10:36:04 16   which is for that individual patient, we can give that

10:36:08 17   patient and her physician a personalized risk score.

10:36:14 18        In addition, we think we are making the Harmony

10:36:17 19   Test the most accessible test in the noninvasive

10:36:22 20   prenatal diagnostic space through our relationship with

10:36:27 21   LabCorp, through our pricing strategy, and through our

10:36:34 22   insurance and reimbursement strategies, making this test

10:36:39 23   available to physicians and their patients.

10:36:46 24        And finally, we think we have streamlined the

10:36:51 25   work flow associated with ordering and receiving our

1                   **STUELPNAGEL**

10:36:56  2   test.   We have access to over 1,000 phlebotomy service

10:37:05  3   centers through our LabCorp relationship.   The LabCorp

10:37:09  4   relationship also brings genetic counseling expertise so

10:37:13  5   that we can help physicians understand the results more

10:37:17  6   completely.   And we think we have the best customer

10:37:24  7   service available.

10:37:27  8          Q.   How has Ariosa developed good relationships

10:37:29  9   with the clinical sites that might become Ariosa's

10:37:32 10   customers?

10:37:33 11          A.   I think we develop good relationships by being

10:37:37 12   upfront, honest in our communication and being

10:37:43 13   responsive to their needs and concerns.

10:37:50 14          Q.   For the clinical sites involved with Ariosa's

10:37:53 15   validation testing, is it Ariosa's intent to attempt to

10:37:58 16   turn those sites into customers after the testing is

10:38:01 17   done?

10:38:03 18          A.   Our intent is to try to convince every

10:38:05 19   physician who manages pregnancy for women to become

10:38:11 20   customers, and that would include our clinical sites.

10:38:16 21          Q.   Do you believe that Ariosa has an advantage

10:38:19 22   with the clinical sites at which it is conducting

10:38:23 23   validation testing for that eventual commercial

10:38:26 24   conversion?

10:38:27 25                  MR. GINDLER:   Objection to the form of the

1                  **STUELPNAGEL**

10:55:49 2   entire pregnant population"?

10:55:51 3      A.   I see that bullet.

10:55:53 4      Q.   And is it Ariosa's commercial strategy to

10:55:57 5   promote the Harmony Prenatal Test to the entire pregnant

10:56:02 6   population?

10:56:02 7      A.   I think it's correct to say our vision at the

10:56:07 8   Harmony Test, everything we've done is with the goal of

10:56:11 9   making this wonderful technology available to all

10:56:14 10   pregnant women.  In terms of how we're positioning it

10:56:18 11   today in the marketplace, I think we try to be very

10:56:23 12   clear that our test is available for physicians to

10:56:28 13   consider for all pregnant women.  We make no

10:56:32 14   restrictions -- we place no restrictions on those

10:56:36 15   physicians on how they choose to order our test.

10:56:39 16      Q.   Is Ariosa informing the market that the Harmony

10:56:43 17   Prenatal Test can be used in any pregnant woman at any

10:56:46 18   time after ten weeks?

10:56:48 19        MR. GINDLER:  Objection to the form of the

10:56:49 20   question.

10:56:51 21        THE WITNESS:  I believe we are saying that the

10:56:58 22   Harmony Test can be used at whatever the physician

10:57:04 23   directs the test to be used for after ten weeks of

10:57:08 24   gestation.

10:57:09 25   BY MR. ROTTER:



1                       STUELPNAGEL

11:19:50  2



11:20:23 10      Q.   If you could flip forward to page 49 of the PDF

11:20:30 11  to the slide titled "Advocate Support for Aria."

11:20:36 12      A.   Yes.

11:20:39 13      Q.   Do you have an understanding of what "Advocate

11:20:41 14  Support for Aria" means?

11:20:45 15      A.   I have not reviewed this specific slide, but my

11:20:48 16  understanding of what we've been trying to do with

11:20:52 17  respect to support for the Ariosa test is to engage

11:21:00 18  special interest groups that have an interest in

11:21:09 19  trisomies, specifically those foundations and

11:21:12 20  associations with Down syndrome, with Trisomy 18 and

11:21:17 21  Trisomy 13, and try to best figure out how we can work

11:21:23 22  as partners in the process of helping patients get the

11:21:29 23  information they need when a Harmony Prenatal Test comes

11:21:34 24  back as high risk.

11:21:38 25      Q.   Do you see in the slide what it says in the



STUELPNAGEL

Q.

STUELPNAGEL

BY MR. ROTTER:

Q.   Does the share price of Sequenom impact Sequenom's -- I'll start that one over.

Does Sequenom's share price impact its ability to raise capital?

MR. GINDLER:  Objection to form.

THE WITNESS:  I don't think so.  Obviously, when a company gets delisted or has a stock price less than $1, its ability to raise money is negatively impacted because of that stock price.  Sequenom once encountered that problem and had to recapitalize and do a reverse split of their stock to get their stock price above $1.

So to the extent that any company falls below a certain minimum where institutional investors feel comfortable investing, your statement is correct; however, in the range that Sequenom is now trading, I have no information that variations on that stock price influence their ability to raise money at all.

MR. GINDLER:  Before you do the next document, would it be okay if we took our lunch break now.

MR. ROTTER:  It would.

MR. GINDLER:  That would be great.

Elizabeth, can you get two copies of the

```
                              STUELPNAGEL
12:18:43   2    LabCorp agreement which are in 6-D.
12:18:49   3              MS. TWAN:  Sure.
12:18:50   4              MR. GINDLER:  Great.
12:18:50   5              We'll get a couple of hard copies for you.
12:18:53   6              MR. ROTTER:  That would be great.
12:18:53   7              MR. GINDLER:  I need to make a phone call.  Now
12:18:54   8    would be a good time to do it.
12:18:56   9              THE COURT REPORTER:  We're going to go off the
12:18:58  10    record if you don't mind.
12:19:00  11              THE VIDEOGRAPHER:  Time off the record is
12:19:01  12    12:18 p.m.
12:19:02  13

12:47:56  14              THE VIDEOGRAPHER:  Time back on the record is
01:36:10  15    1:35 p.m.
01:36:11  16              Counsel, you may proceed.
01:36:13  17              MR. ROTTER:  I will mark the next exhibit,
01:36:18  18    which is, I believe, 28.
01:36:19  19              (Exhibit No. 28 marked for identification.)
01:36:22  20    BY MR. ROTTER:
01:37:49  21         Q.   Do you recognize Exhibit 28?
01:37:51  22         A.   I do.
01:37:52  23         Q.   What is it?
01:37:53  24         A.   It's a pitch dec by a marketing third-party
01:38:00  25    firm.  What I don't know is whether we had actually
```



```
 1                          STUELPNAGEL
01:38:03  2   decided to work with them before this or if this was
01:38:06  3   after we had our engagement letter signed.
01:38:14  4        Q.    Could you flip forward to the page that's
01:38:16  5   labeled at the bottom AD-16189.
01:38:28  6            Do you see at the bottom of that page, there's
01:38:30  7   a sentence that starts with the words "key insight"?
01:38:43  8        A.    I see that.
01:38:45  9        Q.
```

01:39:34 23        Q.    When did that work stop?
01:39:38 24        A.    It would have been a few months ago.  It was in
01:39:41 25   the neighborhood of, you know, sort of a six-month,

STUELPNAGEL

01:42:12  2   MaterniT21 test?

01:42:16  3        A.   No.   In fact, and I think I was appropriately

01:42:18  4   careful in my declaration, too.   We let the data be

01:42:23  5   interpreted by people.   We think both tests are very,

01:42:29  6   very good.   I think if you looked at the strict

01:42:32  7   sensitivity and specificity numbers for Trisomy 21, you

01:42:37  8   would come to maybe the quick conclusion that our test

01:42:41  9   is better.

01:42:42 10        But you asked a very important point earlier

01:42:45 11   around confidence intervals.   And whenever we have

01:42:47 12   cohorts of 100 or 200 or 50, there are error bars around

01:42:55 13   simply the counting statistics of -- of being either

01:42:58 14   good or lucky.

01:43:03 15        Q.   Does Ariosa use its pricing to help the market

01:43:07 16   understand that it is intended to be a replacement for a

01:43:12 17   screening test?

01:43:13 18             MR. GINDLER:   Objection to form.

01:43:15 19             THE WITNESS:   Again, we don't characterize the

01:43:19 20   use of our test to physicians.   We are trying to be

01:43:22 21   very, very careful here now and so I am trying to be

01:43:25 22   careful here so I represent exactly how we feel about

01:43:28 23   this.

01:43:29 24        We will support a physician however they decide

01:43:32 25   to best use our test for their particular patient.   If

1                          STUELPNAGEL

01:43:36  2    that is in front of an invasive test, we will certainly

01:43:40  3    help that physician get those results.  If they want to

01:43:44  4    use this in conjunction with serum maternal screening or

01:43:49  5    first trimester ultrasound and nuchal translucency,

01:43:51  6    we'll support that, too.

01:43:55  7         If they want to use this as a complete

01:43:57  8    replacement to quad maternal screening or replacement to

01:44:00  9    first trimester screening, that's fine with us, too.

01:44:03 10         Our job so to make sure that we are performing

01:44:06 11    this test well, we validated it and have made the right

01:44:09 12    representations about our validation.  So we actually

01:44:13 13    don't think of our test as being a replacement for

01:44:17 14    anything.  We think of it as enabling the physician to

01:44:20 15    make the choices that they can make using our test.

01:44:26 16    BY MR. ROTTER:

01:44:28 17         Q.   But there are some applications for which you

01:44:32 18    would -- strike that.

01:44:35 19         Is it fair to say that Ariosa would feel that

01:44:38 20    it's appropriate for a physician to use the Harmony Test

01:44:41 21    instead of serum maternal screening but that Ariosa does

01:44:45 22    not feel that it's appropriate for a physician to use

01:44:48 23    the Harmony Test instead of an invasive confirmatory

01:44:54 24    procedure?

01:44:55 25         MR. GINDLER:  Objection to form.

1                          STUELPNAGEL

01:44:58  2            THE WITNESS:  Again, that is a decision that we

01:45:01  3   leave to the physician.  We have reservations about

01:45:09  4   using our test as a replacement to invasive testing.

01:45:16  5   The data suggests that once somebody has an identifiable

01:45:21  6   abnormality on ultrasound or through other biochemical

01:45:25  7   tests, only 50 percent of those will be due to the

01:45:28  8   common trisomies, 13, 18 and 21.  And so if the

01:45:31  9   physician decides to use the test in front of an

01:45:35 10   invasive procedure and decide if the test comes back

01:45:39 11   negative or low risk that they are not going to proceed

01:45:42 12   to an invasive test, then as long as the physician makes

01:45:47 13   clear to the patient the benefits of this test and the

01:45:52 14   limitations of this test, whether it's our test or

01:45:54 15   MaterniT21, we're comfortable with that positioning.

01:46:03 16   BY MR. ROTTER:

01:46:03 17        Q.   Understood.  But just to be clear, you would

01:46:06 18   not be comfortable with a physician recommending

01:46:10 19   termination of a pregnancy based solely on the

01:46:14 20   Harmony Test without further invasive confirmation?

01:46:17 21        A.   So that, I agree with.  So that, that point, I

01:46:20 22   actually do agree with, that these tests are too new to

01:46:25 23   be used in that diagnostic realm, that a positive NIPT

01:46:31 24   test, noninvasive prenatal -- prenatal test, whether

01:46:35 25   it's our test or Verinata's test or Sequenom's test,



1                            STUELPNAGEL

02:50:15  2    BY MR. ROTTER:

02:50:15  3        Q.

02:51:43 21        Q.    Could you please flip forward to page 33.

02:51:58 22             Do you see that this slide refers to a soft

02:52:00 23    launch from February 13 to May 7?

02:52:02 24        A.    I see that.

02:52:04 25        Q.    What is a "soft launch"?

|   | STUELPNAGEL |
|---|---|

1                            STUELPNAGEL

03:58:46  2   completely how Verinata has positioned their test.  I

03:58:49  3   will say that they use essentially the same Sequenom

03:58:54  4   technology, the MPSS, and thus, they have cost issues

03:59:02  5   relative to us competitively.

03:59:04  6   BY MR. ROTTER:

03:59:09  7       Q.   From what sources have you derived your

03:59:12  8   understanding of Verinata's test?

03:59:14  9       A.   From their published information on their

03:59:18 10   clinical trials.

03:59:23 11       Q.   Do you consider Verinata to be positioned as

03:59:26 12   well as Ariosa in terms of commercial success?

03:59:34 13       A.   I, again, don't have complete knowledge of how

03:59:36 14   Verinata has chosen to position their test.  I think

03:59:40 15   Ariosa has significant competitive advantages over them.

03:59:44 16       Q.   What are those?

03:59:45 17       A.   Those are the similar ones that we have talked

03:59:47 18   about relative to Sequenom, the fact that we have a more

03:59:52 19   robust clinical trial program, that we provide a more

03:59:57 20   informative result, that we have a simplified process

04:00:05 21   for patients and doctors to use our test, and that we

04:00:12 22   are accessible to all women because we have made our

04:00:17 23   test more affordable.

04:00:18 24       Q.   Is another advantage that Ariosa has over

04:00:20 25   Verinata that its commercial rollout is further along?

| | |
|---|---|
| 1 | STUELPNAGEL |
| 04:00:27  2 | A.   I think the opposite is true.   I think Verinata |
| 04:00:31  3 | would claim, and I think it's accurate, that they are |
| 04:00:35  4 | more commercially advanced than Ariosa. |
| 04:00:38  5 | Q.   Why is that? |
| 04:00:41  6 | A.   It's my understanding that they have soft |
| 04:00:43  7 | launched the test quite a while ago; that they have a |
| 04:00:51  8 | national reach today; that they have hired more than 20 |
| 04:00:56  9 | sales force that are responsible for moding the tests to |
| 04:01:02  10 | those individuals that are trained and in the field. |
| 04:01:06  11 | Q.   Does Verinata have a distribution partner like |
| 04:01:10  12 | Ariosa has LabCorp? |
| 04:01:11  13 | A.   No.  As far as I know, Verinata does not have a |
| 04:01:16  14 | distribution partner. |
| 04:01:19  15 | Q.   Has Ariosa lost any sales to Verinata? |
| 04:01:24  16 | A.   I don't know the answer to that. |
| 04:01:32  17 | Q.   Do you know whether the reverse is true, that |
| 04:01:37  18 | Verinata has lost any sales to Ariosa? |
| 04:01:39  19 | A.   I don't know the answer to that either. |
| 04:01:46  20 | Q.   Do you believe that Ariosa's nationwide sales |
| 04:01:52  21 | force of 20 sales representatives will be as effective |
| 04:02:00  22 | for marketing as Ariosa's partnership with LabCorp? |
| 04:02:08  23 | A.   Just a correction, I think you referred to |
| 04:02:12  24 | Ariosa's 20-person sales force and I believe it was |
| 04:02:15  25 | Verinata's 20-person sales force that you meant to ask. |









STUELPNAGEL

04:24:40 2    A.



04:25:33 12           MR. ROTTER:  We will mark the next exhibit,

04:25:35 13    which is 38.

04:25:35 14           (Exhibit No. 38 marked for identification.)

04:25:36 15    BY MR. ROTTER:

04:26:09 16    Q.   Do you recognize Exhibit 38?

04:26:15 17    A.   I recognize Exhibit 38.

04:26:17 18    Q.   What is it?

04:26:17 19    A.   It's an e-mail that I sent to an acquaintance

04:26:20 20    of mine named Chuck Ludlam.

04:26:27 21    Q.   Do you see the second sentence where it says,

04:26:32 22    referring to Ariosa, "We have purposefully been quiet

04:26:36 23    and are surprised to see that we are even mentioned in

04:26:39 24    this story"?

04:26:40 25    A.   I do see that.





1                              STUELPNAGEL

04:58:46   2

05:00:20  18        Q.    When Ariosa assessed its entry into the market,

05:00:24  19   did it assess possible barriers to entry?

05:00:34  20        A.    Certainly, we have assessed periodically

05:00:37  21   barriers to entry.

05:00:50  22        Q.    Did -- are you aware of any market analysts who

05:00:56  23   have believed that the 540 patent may be a barrier to

05:01:01  24   Ariosa's entry?

05:01:04  25        A.    I am familiar with statements made by Sequenom



STUELPNAGEL - CONFIDENTIAL

1       STUELPNAGEL

06:46:08 2   THE WITNESS:  Actually, not based upon the

06:46:09 3 first Sparks paper.  In the first Sparks paper, we

06:46:13 4 actually had perfect separation between our affected

06:46:18 5 groups with T21 and T18 and our unaffected normal

06:46:25 6 average-risk population.  So based upon that, we could

06:46:28 7 have used a Z score cutoff and had a 100 percent

06:46:32 8 sensitivity and 100 percent specificity in that study.

06:46:36 9   However, we don't think that that provides the

06:46:38 10 best result for the patients and the physicians.  And so

06:46:43 11 by incorporating risk odds, we can individualize our

06:46:50 12 score and provide better information to those women and

06:46:53 13 to those physicians.

06:46:54 14 BY MR. ROTTER:

06:46:54 15  Q.   And is it correct that the ability to provide

06:46:56 16 the risk odds and that individualized determination

06:47:00 17 depends on using the fetal fraction calculated from the

06:47:06 18 polymorphic DNA?

06:47:07 19  A.   It requires the incorporation of percent fetal.

06:47:12 20 We believe that it needs to be done in a very precise

06:47:16 21 manner.  One could conceivably calculate percent fetal

06:47:21 22 in a different way and not use polymorphic loci to do

06:47:26 23 that.

06:47:35 24   MR. ROTTER:  Mr. Gindler, do you have any

06:47:39 25 questions for the witness?

```
 1                    A C K N O W L E D G M E N T

 2

 3   STATE OF                   )

 4                              ) ss.:

 5   COUNTY OF                  )

 6

 7             I, JOHN R. STUELPNAGEL, DVM, hereby certify

 8   that I have read the transcript of my testimony taken

 9   under oath in my deposition; that the transcript is a

10   true, complete and correct record of my testimony, and

11   that the answers on the record as given by me are true

12   and correct.

13

14

15             _____

16                         JOHN R. STUELPNAGEL, DVM

17

18   Signed and subscribed to before

19   me, this _____ day of _____, 20__.

20

21   _____

22   Notary Public, State of _____

23

24

25
```

```
 1                    C E R T I F I C A T E

 2   STATE OF CALIFORNIA

 3   COUNTY OF SAN DIEGO

 4            I, Lynette Marie Nelson, Certified Shorthand

 5   Reporter, in and for the State of California, Certificate

 6   No. 11585,do hereby certify:

 7            That the witness in the foregoing deposition was

 8   by me first duly sworn to testify to the truth, the whole

 9   truth, and nothing but the truth in the foregoing cause;

10   that the deposition was then reported by me in shorthand

11   and transcribed, through computer-aided transcription,

12   under my direction; and that the foregoing transcript, is

13   a true record of the testimony elicited and proceedings

14   had at said deposition.

15            I do further certify that I am a disinterested

16   person and am in no way interested in the outcome of this

17   action or connection with or related to any of the

18   parties in this action or to their respective counsel.

19            In witness whereof, I have hereunto set my hand

20   this 23rd day of May, 2012.

21

22

23

24   _____

25   Lynette Marie Nelson, CSR No. 11585
```