Exhibit C

Trials@uspto.gov
571-272-7822

Paper 24
Entered: March 19, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

ARIOSA DIAGNOSTICS
Petitioner,

v.

ISIS INNOVATION LIMITED
Patent Owner.

————————

Case IPR2012-00022 (MPT)
Patent 6,258,540

————————

Before MICHAEL P. TIERNEY, LORA M. GREEN, and
JEFFREY B. ROBERTSON, Administrative Patent Judges.

GREEN, *Administrative Patent Judge*.


DECISION
INSTITUTION OF INTER PARTES REVIEW
37 C.F.R. § 42.108

Case IPR 2012-00022
Patent 6,258,540

Background

Petitioner Ariosa Diagnostics (Ariosa) requests inter partes review of claims 1, 2, 4, 5, 8, 19-22, 24, and 25 of US Patent No. 6,258,440.  The Patent Owner, Isis Innovation Limited (Isis), submitted a preliminary response (Response, Paper 18).[1] We have jurisdiction under 35 U.S.C. § 314.

Related Proceedings

The '540 Patent is asserted in co-pending litigation captioned as *Ariosa Diagnostics v. Sequenom et al*., N.D. Cal., Case No. 3:11-cv-06391 (Petition i).

The '540 Patent

The '540 patent is drawn to "prenatal detection methods using non-invasive techniques," and, in particular, "to prenatal diagnosis by detecting foetal nucleic acids in serum or plasma from a maternal blood sample" ('540 patent, col. 1, ll. 6-9).

According to the '540 patent, it was unexpected that fetal DNA "is detectable in maternal serum or plasma samples" (*id.* at col. 1, ll. 50-51).  The patent thus "provides a detection method performed on a maternal serum or plasma sample from a pregnant female, which method comprises detecting the presence of nucleic acid of foetal origin in the sample" (*id.* at col. 2, ll. 1-4).  "'Prenatal diagnosis'" is then defined as covering the "determination of any maternal or foetal condition or characteristic which is related to the foetal DNA itself or to the

---

[1] Isis's response, among other things, alleged that Ariosa lacked standing to file the Petition.  Isis' contention concerning standing was considered in a separate paper (Paper No. 20), where it was determined that Isis had failed to demonstrate a lack of standing on Ariosa's part.  Isis' remaining contentions are discussed in this Decision.

Case IPR 2012-00022
Patent 6,258,540

quantity or quality of the foetal DNA in the maternal serum or plasma" (*id.* at col. 2, ll. 6-10).

The patent also teaches that the "preparation of the serum or plasma from the maternal blood sample is carried out by standard techniques," and that "[s]tandard nucleic acid amplification systems can be used" (*id.* at col. 2, ll. 26-27 and ll. 43-47). According to the patent, "[s]ex determination has successfully been performed on pregnancies from 7 to 40 weeks of gestation" (*id.* at col. 3, ll. 60-62).

The '540 patent teaches further that the plasma or serum-based prenatal diagnostic method may be used to determine fetal rhesus D status in rhesus negative mothers, such that the detection of the rhesus D gene in the negative mother is indicative of a rhesus D positive fetus (*id.* at col. 2, l. 57-col. 3, l. 3). The diagnostic methods may also be used to detect haemoglobinopathies or other paternally-inherited DNA polymorphisms (*id.* at col. 3, ll. 4-24).

According to the '540 patent, the non-invasive methods may be also used to screen for Down's syndrome and other chromosomal aneuploidies (*id.* at col. 3, ll. 25-28). The patent teaches that it was known that the level of circulating fetal cells is higher in pregnancies with chromosomal aneuploidies, such as Down's syndrome, and it was further determined that the level of fetal DNA in maternal plasma and serum is also higher (*id.* at col. 3, ll. 30-40). Thus, the patent teaches that quantitative detection of fetal DNA in maternal plasma or serum may thus be used to screen for fetal aneuploidies (*id.* at col. 3, ll. 40-43). Another method that may be used to screen for chromosomal aneuploidies, such as Down's syndrome, as disclosed by the '540 patent is the quantitation of fetal DNA markers on different chromosomes, such as the quantity of fetal chromosomal 21 derived DNA (*id.* at col. 3, ll. 44-51).

Case IPR 2012-00022
Patent 6,258,540

The '540 patent also teaches that quantitation of fetal DNA may be used to monitor certain placental pathologies, such as pre-eclampsia, wherein the concentration of fetal DNA is elevated, possibly due to placental damage (*id.* at col. 3, ll. 52-57).

Claim Interpretation

Claims 1 and 25 of the '540 patent are reproduced below:

1.      A method for detecting a paternally inherited nucleic acid of fetal origin performed on a maternal serum or plasma sample from a pregnant female, which method comprises
        amplifying a paternally inherited nucleic acid from the serum or plasma sample and
        detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample.

25.     A method for performing a prenatal diagnosis on a maternal blood sample, which method comprises
        obtaining a non-cellular fraction of the blood sample
        amplifying a paternally inherited nucleic acid from the non-cellular fraction
        and performing nucleic acid analysis on the amplified nucleic acid to detect paternally inherited fetal nucleic acid.

A claim "shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see also* Office Patent Trial Guide, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).

Ariosa asserts that "the Patent Owner has taken the position that any application of polymerase chain reaction (PCR) techniques to maternal serum or plasma which amplifies extracellular DNA falls within claim because any such technique necessarily amplifies both paternally inherited and maternally inherited DNA" (Petition 3).  Specifically, Ariosa asserts that "the Patent Owner's

Case IPR 2012-00022
Patent 6,258,540

interpretation of the term 'detect' does not require identification of a nucleic acid as paternally inherited; it merely requires that a process identify the presence or existence of nucleic acids, some of which were inherited by [*sic* from] the father" (*id.* at 19).  In addition, Ariosa argues that the "Patent Owner has also taken the position that the application of PCR to a sample is sufficient to meet both the "amplification" and "detection" steps of the Lo patent claims, and the techniques as claimed do not require the enrichment of paternally-inherited DNA over non-paternally-inherited DNA" (*id.* at 20).  Thus, Ariosa asserts, "the claims cover processes that detect fetal DNA irrespective of whether the process is able to distinguish the paternal DNA and the maternal DNA" (*id.* (citing Kazakov Decl. (Ex. 1006), ¶19; Vasioukhin Decl. (Ex. 1008), ¶40; and Mansfield Decl. (Ex. 1007), ¶18)).  Finally, Ariosa argues that "prenatal diagnosis" encompasses "any determination of any maternal of fetal condition related to fetal DNA or the quantity or quality of fetal DNA in maternal plasma or serum, without regard to whether the result is used to diagnose a patient" (*id.*).  Ariosa cites the Declaration of the Patent Owner's expert, Dr. Mark I. Evans (Ex. 1033), filed in *Aria Diagnostics v. Sequenom* in support of the above claim constructions (*id.* at 19-20).

Isis responds that Ariosa's claim interpretation is "unreasonably broad" in that it eliminates an entire step (Response 34).  According to Isis, Ariosa decouples "'detecting'" from "'paternally inherited nucleic acid of fetal origin,'" rendering the term "'detect meaningless' and gives no weight to a material limitation—the entire second step of the claim" (*id.* at 35).  Isis asserts that the second step "requires distinguishing, at some point, fetal from maternal DNA" (*id.* at 37).

Isis also contends it was an error to cite to ¶108 of the Evans Declaration, as that section pertains to the infringing method, and not to claim construction (*id.* at 36).

Case IPR 2012-00022
Patent 6,258,540

We turn first to the construction of claim 1.  As a guide to how one of ordinary skill in the art would have interpreted claim 1, we look to the Declaration of Dr. Mark Evans filed in *Sequenom* v. *Aria Diagnostics et al*., Case No. 3:12-cv-0189 (S.D. Cal. ) (Evans Declaration (Ex. 1033)).

Dr. Evans first opined that the preamble of claim 1 was not a limitation of the claim (Evans Declaration (Ex. 1033), p. 28, ¶91).  As to the limitation of "amplifying a paternally inherited nucleic acid from the serum plasma sample," Dr. Evans stated that "'amplifying'" would have its ordinary and customary meaning of "'increasing the amount by making copies'" (*id.* at p. 30, ¶ 98), and the limitation of "'paternally inherited nucleic acid' meant 'a nucleic acid that originated from the fetus and which was inherited from the father'" (*id.* at p. 30, ¶99).  As to "method for detecting," Dr. Evans was of the opinion that the ordinary artisan would interpret that limitation as "'a method for discovering or determining the existence, presence, or fact of, a nucleic acid that originated from the fetus and which was inherited from the father'" (*id.* at p. 29, ¶ 95).

When Dr. Evans compared the Aria Harmony Prenatal Test (Aria Test) to claim 1 of the '540 patent, Dr. Evans noted that the Aria Test isolates cell-free nucleic acid from the maternal plasma sample, which isolated DNA "is a mixture of both nucleic acid from the mother and nucleic acid from the fetus" (*id.* at p. 31, ¶101).  Thus, according to Dr. Evans, the isolated nucleic acid includes paternally inherited nucleic acid (*id.*).  Dr. Evans then discussed how the nucleic acid is amplified (*id.* at p. 31, ¶102), and how the presence of nucleic acid sequences on chromosome 21 are detected (*id.* at 32-33, ¶¶104-109, especially ¶108).  According to Dr. Evans:

> The nucleic acid sequences detected in a sample are from the mother and the fetus, and the sequences from the fetus are nucleic acid sequences inherited from the mother *and* nucleic acid sequences

inherited from the father. Whether or not a sample is aneuploid, the detected nucleic acids include nucleic acids from the fetus which the fetus inherited from its father.  Thus, by determining the proportion of chromosome 21 (and 18), the Aria method detects nucleic acids inherited from the father, which are "paternally inherited nucleic acids of fetal origin."

(*Id.* at pp. 33-34, ¶108.)

Thus, in Dr. Evans' infringement analysis, there is no need to specifically identify the nucleic acid as being of paternal origin, or even necessarily, of fetal origin.  Stated differently, according to Dr. Evans, if nucleic acid from the serum or plasma of a pregnant female is detected, one is necessarily detecting fetal nucleic acid, which necessarily includes paternally-inherited nucleic acid. Importantly, there is no need to specifically distinguish whether the DNA is of maternal or paternal origin, or even if the DNA is of maternal or fetal origin.  All that is required by the detection step of claim 1 of the '540 patent is that nucleic acid, which includes the fetal nucleic acid, be detected.

The above analysis is consistent with expert declarations submitted by Ariosa.  For example, Dr. Kazakov notes that "[u]nder the patent holder's interpretation, the patented process includes detection of fetal DNA irrespective of whether the process is able to distinguish the DNA originating from the father from the DNA originating from the mother" (Kazakov Decl. (Ex. 1006), p. 15, ¶19; *see also* Mansfield Decl. (Ex. 1007), p. 20, ¶18; Vasioukhin Decl. (Ex. 1008), p. 16, ¶40).

We credit the Declaration testimony discussed supra, and find it to be consistent with the broadest reasonable interpretation of claim 1 read in light of the disclosure of the '540 patent.  As a result, based on the record before us, we interpret claim 1 as requiring a method that includes a step of amplifying nucleic

Case IPR 2012-00022
Patent 6,258,540

acid from a serum or plasma sample from a pregnant female, such as by PCR.  The amplified nucleic acid would necessarily include fetal nucleic acid, and the fetal nucleic acid necessarily includes paternally inherited nucleic acid.  The claim also requires a step of detecting the presence of nucleic acid, which again, necessarily includes fetal nucleic acid, and which necessarily includes paternally inherited nucleic acid.  Notably, the detection step of claim 1 does not require that the nucleic acid be specifically identified as being inherited from the father or even as being from the fetus, only that it be identified as containing some level of nucleic acid.

We have carefully considered the arguments advanced by Patent Owner Isis, but they do not convince us to the contrary.  First, the infringement analysis performed by Dr. Evans, such as in ¶108 of the Evans Declaration, is very relevant to claim interpretation, as it reflects how the patent owner is interpreting the claims such that the alleged infringing product is covered by the asserted claim.  Moreover, the above interpretation does not exclude any step of the claim.  It includes an amplifying step, and a step of detecting "the presence of paternally inherited nucleic acid of fetal origin."  As noted by Dr. Evans, the ordinary artisan would interpret "detect" as only requiring "discovering or determining the existence, presence, or fact of," thus determining the presence of fetal nucleic acid does not require distinguishing it from maternal nucleic acid.

In addition, central to Ariosa's argument that the '540 patent is not entitled to priority back to British priority application serial number 9704444, filed March 4, 1997, is the interpretation of the term "fetal" (see section entitled "Effective filing date," *infra*).  As discussed below, we interpret DNA of fetal origin that could be detected using the disclosed methods in view of the Specification as DNA from a fetus from 7 to 40 weeks of gestation.

Case IPR 2012-00022
Patent 6,258,540

As to claim 25, which recites "[a] method of performing a prenatal diagnosis," Dr. Evans stated that he understood that recitation was in the preamble, and thus not a claim limitation (Evans Decl., p. 41, ¶141).

The body of claim 25 requires the steps of: 1) obtaining a non-cellular fraction of the blood sample; 2) amplifying a paternally inherited nucleic acid from the non-cellular fraction; and 3) performing nucleic acid analysis on the amplified nucleic acid to detect paternally inherited fetal nucleic acid.  There is nothing in the body of the claim that requires diagnosis, and it sets forth a full process, that is obtaining, amplifying, and detecting.  It is not clear what additional steps are required by the recitation in the preamble of "[a] method of performing a prenatal diagnosis."  Thus, based on the record before us, we interpret the preamble of claim 25 as not limiting the process steps set forth in the body of the claim.

As to the step of "performing nucleic acid analysis on the amplified nucleic acid to detect paternally inherited fetal nucleic acid," Dr. Evans appears to equate it with detecting paternally inherited fetal nucleic acid (Evans Declaration, p. 41, ¶144).  We credit Dr. Evan's testimony for the reasons set forth above, and we interpret this step as we did the "detecting" step of claim 1.

Effective filing date

Ariosa cites Lo (Ex. 1016) and Schallhammer (Ex. 1022) in challenging the patentability of the '540 patent, which references are only prior art if the '540 patent is not entitled to priority back to British priority application serial number 9704444, filed March 4, 1997, under 35 U.S.C. §§ 119 and 120.  Specifically, Ariosa cites *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004), for the proposition "that a change in the specification that alters the scope of a claim term renders invalid a claim for benefit under § 119 or § 120" (Petition 29).

9

Case IPR 2012-00022
Patent 6,258,540

In order to receive priority, the invention must be disclosed in a manner that meets the requirements of § 112, first paragraph, that is, the enablement and written description requirements. *Chiron*, 363 F.3d at 1253.

In the Petition, Ariosa asserts that the British priority application serial number 9704444 does not support the claims of the '540 patent, and thus Isis is not entitled to claim priority back to British priority application (Petition 2). Ariosa notes that the British priority application of the '540 patent refers to fetal testing during 12 to 40 weeks of gestation, whereas the '540 patent refers to fetal testing from 7 to 40 weeks of gestation (Petition 27-28).

Ariosa argues that the extra five weeks is significant because fetal development is generally considered to begin at 11 weeks, and prior to 11 weeks, the human organism is referred to as an embryo (Petition p. 28 (citing Robbins (Ex. 1020), p. 441, Fig. 10-7). Ariosa also cites the Kazakov (Ex. 1006) and Vasioukhin (Ex. 1008) Declarations as evidence that the skilled artisan would interpret "fetal" as used in the claims differently based on the British priority document than as based on the '540 patent (*id.* at 28-29).

Isis responds that the portion of the Specification being relied upon by Ariosa does not refer to fetal, and thus cannot be said to broaden the definition of fetal (Response 28). According to Isis, the passage relied upon by Ariosa refers to prenatal screening programs, and "'[p]renatal' covers the entire period from conception to birth" (*id.*). Isis also cites Bianchi (Ex. 1011, p. 850, col. 1, ¶1), Simpson, (Ex. 1025, p. 1236, col. 2, ¶2), and Devaney (Ex. 2017, p. 633, col. 1, ¶2, and ¶ bridging pages 643-644) as evidence that as used in the non-invasive prenatal diagnosis field, the umbrella of "fetal" includes both embryonic and fetal stages (Response 29). Isis further contends that the Robbins reference is a pathology textbook, and is thus not drawn to the relevant art (*id.* at 28).

Case IPR 2012-00022
Patent 6,258,540

Isis also asserts that the *Chiron* case is inapposite, as the patent involved in that case expressly defined monoclonal antibody, whereas there is no express definition of fetal in the '540 patent (*id.* at 29).

The issue in *Chiron* was whether the asserted claims were entitled to priority to a series of earlier filed applications. *Chiron*, 363 F.3d at 1250. The claims of Chiron's asserted patent were drawn to a monoclonal antibody that binds to a human c-erbB-2 antigen. *Id.* The disclosure defined monoclonal antibody as not being limited to its source or the method of its making. *Id.* at 1251-52. After the patent issued, Chiron sued Genentech for its sales of a humanized antibody. *Id.* at 1252. The trial court construed the claims as encompassing chimeric and humanized antibodies, but a jury found that the patent was not entitled to priority to the earlier filed applications. *Id.*

On appeal, the Court of Appeals for the Federal Circuit, addressed the written description requirement of 35 U.S.C. § 112, first paragraph. Specifically, the court noted that it "prevents applicants from using the amendment process to update their disclosures (claims or specifications) during their pendency," noting that "[o]therwise applicants could add new matter to their disclosures and date them back to their original filing date, thus defeating an accurate accounting of the priority of invention." *Id.* at 1255. According to the court, chimeric antibodies did not exist at the time of the prior application, "[t]hus, axiomatically, Chiron cannot satisfy the written description requirement for the new matter appearing in the … patent, namely chimeric antibodies." *Id.* (citing *In re Kaslow,* 707 F.2d 1366, 1375 (Fed.Cir.1983) ("The test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to the artisan that the inventor had possession at that time of

11

Case IPR 2012-00022
Patent 6,258,540

the later claimed subject matter, rather than the presence or absence of literal support in the specification for the claim language." (citation omitted))).

Thus, in the *Chiron* case, even though the earlier filed applications contained support for the term monoclonal antibody, which was the term contained in the asserted claims, the earlier applications did not provide support for how it was construed based on the disclosure of the asserted patent.

The claims of the '540 patent are directed to methods of detecting paternally inherited nucleic acid of "fetal" origin (*see, e.g.,* claim 1). As set forth in the '540 patent, one of the uses of the screening method is sex determination ('540 patent, col. 3, ll. 58-62; col. 4, Example 1; col. 25, claim 12). Thus, the skilled artisan, reading the '540 patent, would understand that the DNA of fetal origin that could be detected using the disclosed methods could be from a fetus from 7 to 40 weeks of gestation. In contrast, upon reading the British priority application serial number 9704444, the artisan would understand that the DNA of fetal origin that could be detected using the disclosed methods could be from a fetus from 12 to 40 weeks of gestation.

We do not agree with Isis that the *Chiron* case is inapposite on the basis that there is no express definition of fetal in the '540 patent. As stated in *Kaslow*, cited by the *Chiron* court, the issue is not the presence or absence of literal support, but what the disclosure as filed reasonably conveys to the skilled artisan.

As to how the term is used in the prior art, Robbins defines the embryonic period as the first 9 weeks of pregnancy, and the fetal period terminating at birth (Robbins (Ex. 1020), p. 440, second col.). While Robbins is a pathology textbook, the definition of embryo and fetus as used in Robbins speaks generally to intrauterine development of humans. Bianchi teaches that "candidate fetal cells were isolated … at 12 ½ - 17 weeks gestation" (Bianchi (Ex. 1011), Abstract).

12

Case IPR 2012-00022
Patent 6,258,540

Simpson, however, states that in two women carrying male fetuses, "Y-specific signals were detected at 33 and 40 days gestation" (Simpson, (Ex. 1025), p. 1236, col. 2). The first portion of Devaney, relied upon by Isis, speaks to gestational age (Devaney (Ex. 2017), p. 633, col. 1, ¶2). The second portion of Devaney teaches that:

> [T]he overall performance of noninvasive fetal sex determination using maternal blood can be high, if performed using RTQ-PCR on a blood sample taken at a time during pregnancy when sufficient cell-free fetal DNA is present (7 weeks gestation or later). This technology can be useful in clinical settings for early detection of fetuses at risk for sex-linked disorders requiring follow-up testing.

(*Id.* at ¶ bridging 634-635.)

As can be seen from the above excerpts, what is considered "fetal" seems to vary by publication, as well as the method or use being discussed. Therefore, the ordinary artisan would look to the disclosure of the British priority application and the '540 patent for a definition of "fetal" to determine what constitutes nucleic acid of fetal origin that could be detected by the disclosed method. And as discussed above, that definition differs based on the disclosure of the '540 patent as opposed to the British priority application serial number 9704444.

Thus, we accord the '540 patent an effective filing date of March 4, 1998, the filing date of the PCT application resulting in the '540 Patent.

### Challenges

The standard for instituting an inter partes review is set forth in 35 U.S.C. § 314(a), which states:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response

Case IPR 2012-00022
Patent 6,258,540

filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Inter partes review is only instituted if the petition supporting the ground demonstrates "that there is a reasonable likelihood that at least one of the claims challenged in the petition is unpatentable." 37 C.F.R. § 42.108(c). In making that determination, the Board considers both the petition and the preliminary response of the patent owner. *Id.*

The prior art references relied upon Ariosa are:

Lo et al., *Presence of fetal DNA in maternal plasma and serum*, 350 LANCET 485-487 (1997) (Ex. 1016).

Simpson et al., *Isolating Fetal Cells in Maternal Circulation for Prenatal Diagnosis*, 14 PRENATAL DIAGNOSIS 1229-1242 (1994) (Simpson 1994) (Ex. 1025).

Kazakov et al., *Extracellular DNA in the Blood of Pregnant Women*, 37(3) CYTOLOGY (TSITOLOGIA) 232-236 (1995) (Ex. 1014).

Schallhammer et al., *Phenotypic comparison of natural killer cells from peripheral blood and from early pregnancy decidua*, 3 EARLY PREGNANCY: BIOLOGY AND MEDICINE 15-22 (1997) (Ex. 1022).

Gocke et al., US Patent No. 6,156,505, issued December 5, 2000 (Ex. 1002).

Cotran et al., *Robbins: Pathological Basis of Disease* 1071-1088 (5th ed. 1994) (Ex. 1021).

The challenges presented by Ariosa are:

I.      Claims 1, 2, 4, 5, 19-22, 24, and 25 are anticipated under 35 U.S.C. § 102(a) by Lo (Petition 34).

Case IPR 2012-00022
Patent 6,258,540

   II.     Claim 8 is obvious over the combination of Lo and Simpson (Petition 42).

   III.    Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 are anticipated under 35 U.S.C. § 102(b) by Kazakov (Petition 43).

   IV.    Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 are obvious over the combination of Simpson, Schallhammer, and Kazakov (Petition 49).

   V.    Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 are obvious over the combination of Gocke, Robbins, and Simpson (Petition 53).

I.    Claims 1, 2, 4, 5, 19-22, 24, and 25 anticipated by Lo

Lo studied whether fetal DNA could be detected in maternal plasma and serum (Lo (Ex. 1016), p. 485, second col.).  Blood samples were collected from pregnant women, and the plasma and serum were obtained (*id.*).  The DNA was extracted and processed for PCR (*id.*).  Primers for Y chromosome specific sequences were used, and it was determined that from the 43 women from whom plasma and serum were collected, there were 30 male and 13 female fetuses (*id.* at 486, first col.).  Lo thus noted that the "results show that fetal DNA is present in maternal plasma and serum," and that "[u]se of maternal plasma or serum for the detection of fetal DNA for non-invasive prenatal diagnosis may therefore be possible" (*id.*).

*Claim 1*

As to claim 1, Lo teaches a step of amplifying paternally inherited nucleic acid that was obtained from plasma or serum by teaching the use of Y chromosome specific primers in PCR to amplify DNA extracted from plasma and serum samples (*see* Petition 38-39).  Lo then teaches the step determining that there were

Case IPR 2012-00022
Patent 6,258,540

30 male and 13 male fetuses, thus Lo teaches the step of detecting the presence of paternally inherited nucleic acid of fetal origin in the sample (*see id.* at 39-40).

Isis asserts that it will remove the Lo reference as a reference under *In re Katz*, 6787, 450 (CCPA 1982) (Response 31).  As to Ariosa's argument that Ms. Corbett may be a co-inventor, Isis argues that there is no evidence of record that Ms. Corbetta made an inventive contribution to the method claimed by the '540 patent (*id.*).

We have considered Isis' response that they will submit an *In re Katz* type Declaration, but the Declaration cannot be considered until it is made of record in the instant proceeding.

*Claim 2*

Claim 2 adds the limitation that fetal nucleic acid is amplified by PCR, and is thus taught by Lo (*see* Petition at 38-39).

*Claims 4 and 5*

Claim 4 adds the limitation that the fetal nucleic acid is detected by means of a sequence specific probe, and claim 5 adds the limitation that fetal nucleic acid from the Y chromosome is detected.  Lo teaches the use of a Y chromosome specific probe, and thus teaches these limitations (*see* Petition at 40).

*Claims 19 and 20*

Claim 19 adds the limitation that the sample contains fetal DNA "at a fractional concentration of total DNA of at least about 0.14%, without subjecting it to a foetal DNA enrichment step."  Claim 20 further limits claim 19 to a fractional fetal DNA concentration of 0.39%.

Case IPR 2012-00022
Patent 6,258,540

Ariosa asserts that the recited concentrations are inherent properties of maternal blood composition (*id.* at 40-41(citing the '540 patent, col. 1, ll. 58-64)). We agree, and thus the limitations of claims 19 and 20 would have been inherent to the samples used by the Lo paper.

*Claim 21*

Claim 21 is an independent claim drawn to a method of performing a prenatal diagnosis, wherein the last step of the claim is drawn to "providing a diagnosis based on the presence and/or quantity and/or sequence of the foetal nucleic acid." In addition, claim 21 requires the steps of providing a maternal blood sample, separating it into a cellular and non-cellular fraction, and detecting the presence of a nucleic acid of fetal origin according to the method of claim 1.

As discussed above, Lo teaches the method of claim 1, and also teaches the steps of providing a maternal blood sample, and separating it into a cellular and non-cellular fraction. As to the diagnosis, Petitioner Ariosa relies on Lo's discussion that based on the finding that fetal DNA is present in maternal serum, the use of maternal plasma or serum for prenatal diagnosis may be possible (Petition 41). Moreover, Lo also teaches that they were able to determine which women were carrying male fetuses and those who were carrying female fetuses, and thus the method was diagnostic of the sex of the fetus. Therefore, Lo teaches methods of diagnosis.

*Claim 22*

Claim 22 is dependent on claim 21, and adds the limitation that the non-cellular fraction is a plasma fraction. As previously discussed, Lo teaches obtaining fetal DNA from maternal serum (*see id.* at 41).

Case IPR 2012-00022
Patent 6,258,540

*Claim 24*

Claim 24 is an independent claim, and requires the steps of "removing all or substantially all nucleated and anucleated cell populations from the blood sample," and "amplifying a paternally inherited nucleic acid from the remaining fluid and subjecting the amplified nucleic acid to a test for the Paternally inherited fetal nucleic acid." As discussed above for claim 1, Lo teaches using a serum or plasma sample, which is the fraction of the blood from which the cells have been removed, amplifying the paternally inherited nucleic acid, and then testing (that is, detecting) for the paternally inherited nucleic acid (*see id.* at 38-40).

*Claim 25*

As to independent claim 25, as already discussed above with respect to claim 1, Lo teaches the steps of "obtaining a non-cellular fraction of the blood sample," "amplifying a paternally inherited nucleic acid from the non-cellular fraction," and "performing nucleic acid analysis on the amplified nucleic acid to detect paternally inherited fetal nucleic acid" (*see id.*).

We conclude that Ariosa has demonstrated that there is a reasonable likelihood that claims 1, 2, 4, 5, 19-22, 24, and 25 are anticipated under 35 U.S.C. § 102(a) by Lo.

II.     Claim 8 rendered obvious by the combination of Lo and Simpson

Claim 8 is drawn to the method of claim 1, "wherein the presence of a foetal nucleic acid from a paternally-inherited non-Y chromosome is detected."

The teachings of Lo are described above.

Simpson reports that a group studied DNA obtained from maternal blood in three pregnancies at risk for β-thalassemia/hemoglobin Lepore$_{Boston}$ (Simpson (Ex.

Case IPR 2012-00022
Patent 6,258,540

1025), p.1233, second col.).  As explained by Simpson 1994, "[h]emoglobin Lepore$_{Boston}$ is a hybrid δ-β globin gene, resulting from an unequal crossing over between misaligned β and δ genes" (*id.*).  PCR was used to amplify for "[h]emoglobin Lepore$_{Boston}$ specific DNA in unsorted maternal blood, and the hemoglobinopathy was correctly identified in two fetuses" (*id.*).  Simpson also teaches that similar techniques may be used to determine Rh(D) status (*id.* at 1234, first col.).

We therefore agree with Ariosa that Simpson teaches that single gene traits, such as hemoglobin Lepore$_{Boston}$, may be inherited from the father, and can be identified by PCR using probes specific for the hemoglobin allele (Petition 42).

We therefore conclude that Ariosa has demonstrated that there is a reasonable likelihood that claim 8 is rendered obvious by the combination of Lo and Simpson.

III: Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 anticipated Kazakov

Kazakov teaches that it is known that extracellular DNA is contained in the blood of humans and animals (Kazakov (Ex. 1014), p. 232).  Kazakov studied the sera from blood of women in both the first and third trimesters of pregnancy, as well as women with late toxicosis of pregnancy (*id.* at 233).  Kazakov then performed PCR using DNA preparations from the serum using primers for Alu repeats (*id.*).  The primers used by Kazakov were the Tc65, B1, and C2 primers (*id.*).  Kazakov teaches that the concentration of Mg$^{2+}$ ions used in the PCR reaction was between 2-5 mM (*id.*).

In Figure 1, Kazakov shows the DNA fragments obtained, wherein in Figure 1 DNA from the blood of a male, the DNA of a nonpregnant female, DNA from a pregnant woman in the first trimester, and DNA from a pregnant woman in the

19

Case IPR 2012-00022
Patent 6,258,540

third trimester are shown (*id.* at Insert VIII, Figure 1).  In Figure 2, DNA from serum of several pregnant women in their first trimester is shown (*id.* at Insert VIII, Figure 2).

Kazakov reported that during pregnancy, there is initially an increase in concentration of low-molecular weight DNA, and that inter-ALU repeats have been detected only in the blood of women in the first trimester of pregnancy (*id.* at 234).  Kazakov notes that both the cells of the fetus (trophoblasts) and the mother (cells of the endometrium and lymphocytes) may excrete DNA (*id.* at 235).

Ariosa asserts that claims 1, 2, 4, 5, 8, 19-22, 24, and 25 are anticipated by Kazakov when the claims are given their broadest reasonable interpretation as urged by the Patent Owner in the co-pending litigation (Petition 43).


*Claim 1*

As to claim 1, Ariosa notes that Kazakov amplified DNA from the serum of pregnant women (*id.* at 43-44).  Ariosa cites the Kazakov and Mansfield Declarations as support that the B1 and C2 primers are known to amplify sequences throughout the human genome, including on the Y chromosome (*id.* at 44 (citing Kazakov Decl. (Ex. 1006) ¶¶ 11 and 26; Mansfield Decl. (Ex. 1007), ¶¶ 51-69).  Thus, Ariosa asserts that Kazakov meets the limitation of claim 1 of "amplifying a paternally inherited nucleic acid from the serum or plasma sample" (Petition 43-44).

Ariosa asserts that because the Kazakov reference described using serum from pregnant females to identify extracellular nucleic acids, the samples, as a scientific fact, contained extracellular DNA from the fetus, and thus Alu-containing repeats from the fetus were also amplified (*id.*).  As claim 1 of the '540

Case IPR 2012-00022
Patent 6,258,540

patent only requires that fetal extracellular DNA be amplified and detected, Ariosa argues that the Kazakov reference meets all of the limitations of claim 1 (*id.* at 46).

In his Declaration, Professor Kazakov states that the B1 and C2 primers described in the Kazakov reference would have amplified Alu repeats located in the Y chromosome (Kazakov Decl. (Ex. 1006), ¶26). In making that statement, Professor Kazakov cites a GenBank BLAST search that is presented in Exhibits 48 and 49 (*id.* at ¶26, fn. 30).

In her Declaration, Dr. Mansfield states that she has "confirmed that the protocols used by Kazakov would have indeed amplified and detected paternally-inherited DNA in the non-cellular blood components of a pregnant female" (Mansfield Decl. (Ex. 1007), p. 36, ¶51). The procedures described in the Declarations used the Tc65 primer, extracellular DNA from male subjects, or extracellular DNA from females carrying either a male or female fetus (*id.* at p. 36, ¶52). In order to confirm that the Tc65 primer indeed amplified Y specific sequences, Dr. Mansfield also used a nested PCR strategy and Y-specific primers (*id.* at p. 37, ¶53). As stated in the Declaration, inter-Alu PCR was performed in a PCR reaction buffer that contained a final concentration of 5mM $Mg^{2+}$ (*id.* at p. 39, ¶57). According to Dr. Mansfield, "[i]t is also unequivocally clear from these data that Y chromosome-specific DNA was amplified in the inter-*Alu* PCR of Kazakov *et al.*" (*id.* at p. 47, ¶69).

Isis argues that Ariosa admits that Kazakov does not disclose step 2 of claim 1, that is "detection of paternally inherited DNA of fetal origin," in admitting that the Kazakov reference does not "'identify the extracellular DNA as specifically fetal, or distinguish paternally inherited fetal DNA from maternally-inherited fetal DNA'" (Response 39).

Case IPR 2012-00022
Patent 6,258,540

As set forth in the claim construction analysis above, the detection step of claim 1 does not require distinguishing nucleic acid as being inherited from the father or even as being from the fetus, only that it be identified as containing some level of nucleic acid.  The Kazakov reference meets that limitation, as it does identify the amplified nucleic acid from the serum of pregnant females (*see* Kazakov, Inset VIII, Figures 1 and 2).

Moreover, Isis argues that Ariosa has failed, both legally and scientifically, to demonstrate that Kazakov inherently discloses amplifying fetal DNA (Response 40).  Isis notes that "'[i]nherency may not be established by probabilities or possibilities.  The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient'" (*id.* at 40 (quoting *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F. 2d 1264, 1269 (Fed. Cir. 1991) (citations omitted)).  Isis further notes that "in determining whether a limitation is inherent, *it is improper to conjecture* as to what a reference would teach *if* it were carried out in a manner not expressly disclosed" (Response 41 (quoting *Perricone v. Medicis Pharmaceutical Corp.,* 432 F. 3d 1368, 1378 (Fed. Cir. 2005)).

Specifically, Isis argues that "Ariosa attempts to show that *if* Kazakov had performed amplification using the Tc65 primer on maternal serum samples containing *male* fetal DNA, he would have amplified paternally inherited fetal nucleic acid" (Response 41).  Isis asserts, however, that Kazakov is silent on the gender of the fetuses, and Ariosa provides no evidence that the samples obtained from pregnant females contained DNA from a male fetus (*id.*).  According to Isis, "because all of Kazakov's samples could have contained nucleic acid from female fetuses and no male fetuses, *Ariosa failed as a matter of law* to prove that Kazakov inherently amplified Y chromosome nucleic acid" (*id.* at 42).

Case IPR 2012-00022
Patent 6,258,540

Isis asserts further that the Kazakov reference itself is evidence that cell-free
fetal DNA was not amplified, as "Kazakov amplified sequences using the Tc65
primer in first trimester samples but *not* in third trimester samples" (*id.* at 42-43).
Isis argues that as the concentration of cell-free DNA increases in the third
trimester, Kazakov should have seen amplification products from the third-
trimester maternal samples (*id.* at 43 (citing Ex. 1001, p.1, ll. 59-62; Ex. 2016, p.
341, col. 2, ¶3)).

Isis also argues that Kazakov used "PCR to test the DNA for inter-Alu
sequences using primer Tc65 and analyzed the PCR products by gel
electrophoresis that did not discriminate any individual PCR products" (Response
43).  Thus, Isis asserts that Ariosa "cannot point to Kazakov to show that the Tc65
primer amplified paternally inherited fetal DNA—it is impossible to detect any
particular PCR fragment, much less a Y-specific one" (*id.*).  Isis argues further that
Nelson was Kazakov's source for the Tc65 primer, and while Nelson had shown
that Tc65 amplifies a sequence on the X chromosome, the reference is silent on
whether it amplifies a Y chromosome sequence (*id.* at 43-44 (citing Nelson, Ex.
2036)).

Isis further asserts that although Ariosa relies on the Mansfield Declaration
as repeating Kazakov's experiment to demonstrate that Tc65 amplifies a Y
chromosome sequence, Mansfield did not use the same PCR conditions as
Kazakov (Response 44).  Specifically, Isis asserts that Kazakov used 2-5 mM
$Mg^{2+}$, while Mansfield used 5mM $Mg^{2+}$, which difference, Isis asserts, "is highly
likely to have affected the outcome of the experiment" (*id.* (citing Ex. 2037, p. 511,
Fig. 1)).  At best, Isis asserts, the Declaration demonstrates that Kazakov "*might*
have amplified Y chromosome DNA—if his samples even contained male fetal

Case IPR 2012-00022
Patent 6,258,540

DNA; it did not prove that amplifying Y chromosome DNA was a *necessary* result of Kazakov's experiment" (Response 44-45).

We have carefully considered the arguments of Isis made in the Preliminary Response, as well as the evidence those arguments rely upon, and the arguments and evidence of Ariosa, and conclude that Ariosa has set forth a reasonable likelihood that claim 1 is anticipated by Kazakov.

First, as set forth in the claim construction and discussed above, Kazakov sets forth the amplification step using DNA extracted from the serum of pregnant females. We have considered the arguments of Isis that there is no evidence that fetal DNA was amplified, but do not find them convincing. As discussed by the '540 patent and the Evans Declaration, the presence of fetal DNA in the serum and plasma of pregnant females is inherent (*see, e.g.*, Evans Decl., ¶20). In addition, a healthy fetus has a full set of chromosomes, half of which were inherited from the mother and half of which were inherited from the father (Evans Decl., ¶45). Thus, as Kazakov performed PCR on the sera from blood of women in the first trimester of pregnancy, the extracellular nucleic acid of the fetus would have been amplified (*see* Evans Decl., ¶108). Note that there is nothing in claim 1 that requires the use of a Y specific sequence.

As to the fact that Kazakov observed amplification of nucleic acid in the first trimester and not the third trimester, such does not necessarily demonstrate that extracellular DNA from the fetus was not present in the serum to be amplified. In fact, it would be against the weight of evidence of record, as both Petitioner and Patent Owner appear to agree, that the presence of extracellular nucleic acid from the fetus in the serum or plasma of the pregnant female is an inherent property of that serum or plasma. So that inconsistency in Kazakov, on this record, does not convince us that Kazakov did not inherently amplify fetal DNA.

24

Case IPR 2012-00022
Patent 6,258,540

We do agree with Isis, however, that it is unclear what was amplified by the B1 and C2 primers described in the Kazakov reference, as Ariosa does not point to where Exhibits 48-49 referenced in footnote 30 of Professor Kazakov's Declaration may be found.  Nevertheless, the Mansfield Declaration supports a conclusion that Ariosa has provided sufficient evidence to support a reasonable expectation that the Tc65 primer inherently amplifies sequences in the Y chromosome.  We have considered Exhibit 2037, relied upon by Isis for demonstrating that the PCR conditions were different enough from those used in the Kazakov reference, such that the Mansfield Declaration cannot be relied upon to demonstrate that the Tc65 primer would have amplified Y specific sequences.

In Exhibit 2037, Kazakov teaches:

> Experiments on isolated chromosomes and hybrid lines showed that the spectrum of fragments obtained in Alu-PCR depends to a very large extent on the conditions of PCR, especially on the concentration of $Mg^{++}$ (Fig. 5, *b*), which of course needs to be taken into account in this work.  The discrete picture of fragments was observed only at low $Mg^{++}$ concentrations (1-3 mM), this concentration being experimentally selected for each chromosome.   At higher $Mg^{++}$ concentrations the discrete picture was entirely absent.   It is also noteworthy that the PCR products contained short fragments of identical length on different chromosomes (including an unknown chromosome present in the hybrid).

(Ex. 2037, p. 514.)

Thus the Exhibit does not support that the fragments will not be amplified, but only how the fragments are visualized, that is, whether a discrete picture of fragments is obtained.

Case IPR 2012-00022
Patent 6,258,540

*Claim 2*

Claim 2 specifies that the fetal nucleic acid is amplified by PCR.  As explained above, Kazakov teaches the use of PCR.

*Claims 4 and 5*

Claim 4 specifies that the fetal nucleic acid is "detected by means of a sequence specific probe," and claim 5 specifies that that the "presence of a foetal nucleic acid from the Y chromosome is detected."  Ariosa references the discussion of claim 1 above, asserting that PCR technique of Kazakov "used a primer specific to a Y chromosome sequence" (Petition 46).  We agree that the Mansfield Declaration demonstrated a reasonable likelihood that the Tc65 primer used by Kazakov amplified Y specific sequences.

*Claim 8*

Claim 8 requires that "the presence of a paternally inherited non-Y chromosome is detected."  Ariosa asserts that that "the Kazakov method 'detected' paternally non-Y chromosomes because Alu repeats on non-Y chromosomes would have been amplified by the B1 and C2 primers used by Professor Kazakov" (*id.*).  However, as discussed above, it is unclear what was amplified by the B1 and C2 primers described in the Kazakov reference, as Ariosa does not point to where Exhibits 48-49 referenced in footnote 30 of the Kazakov Declaration may be found.  *See* 37 CFR § 42.65(a) (noting that "[e]xpert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight").

We thus conclude that Ariosa has not set forth a reasonable likelihood that claim 8 is anticipated by Kazakov.

Case IPR 2012-00022
Patent 6,258,540

*Claims 19 and 20*

Claim 19 adds the limitation that the sample contains fetal DNA "at a fractional concentration of total DNA of at least about 0.14%, without subjecting it to a foetal DNA enrichment step."  Claim 20 further limits claim 19 to a fractional fetal DNA concentration of 0.39%.

Ariosa asserts that the recited concentrations are inherent properties of maternal blood composition (*id.* at 46-47(citing the '540 patent, col. 1, ll. 58-94). We agree, and thus conclude that the limitations of claims 19 and 20 would have been inherent to the samples used by the Kazakov reference.

*Claims 21 and 22*

Claim 21 is an independent claim drawn to a method of performing a prenatal diagnosis, wherein the last step of the claim is drawn to "providing a diagnosis based on the presence and/or quantity and/or sequence of the foetal nucleic acid."

Ariosa asserts that the "skilled artisan would have understood that the purpose of the genetic testing described in Professor Kazakov's publication was diagnostic" (Petition 47).  According to Ariosa, "[a]s Professors Kazakov and Vasioukhin and Drs. Mansfield and Barker explain in their declarations, the Kazakov paper reports that the extracellular DNA may have a regulatory function and thus analysis of that DNA would have been understood to have inherent diagnostic value" (*id.*).  Ariosa also notes that the Kazakov reference specifically used serum from patients with late stage toxicosis (preeclampsia), and that the references cited in the endnotes the Kazakov reference "are specifically directed to the analysis of cellular and extracellular DNA for diagnostic purposes" (*id.*).

Case IPR 2012-00022
Patent 6,258,540

We conclude that Ariosa has not established a reasonable likelihood that claim 21 is anticipated by the Kazakov reference. First, Ariosa does not point to where in the Kazakov reference itself a diagnosis is presented. Instead Ariosa points out that the Kazakov reference used serum from patients with late stage toxicosis, but does not point to anywhere in the reference where the presence of nucleic acid may be used to diagnosis late stage toxicosis. Ariosa also points to several of its Declarations, but does not point to any specific portion of those Declarations. Finally, the challenge proposed by Ariosa is an anticipation challenge, and thus the additional references cited Ariosa may not be used to make up any deficiencies of the Kazakov reference.

Claim 22 is dependent on claim 21, and thus suffers from the same deficiencies as the proposed challenge of claim 21.

We thus conclude that Ariosa has not set forth a reasonable likelihood that claims 21 and 22 are anticipated by Kazakov.

*Claim 24*

Claim 24is an independent claim, and requires the steps of "removing all or substantially all nucleated and anucleated cell populations from the blood sample," and "amplifying a paternally inherited nucleic acid from the remaining fluid and subjecting the amplified nucleic acid to a test for the Paternally inherited fetal nucleic acid." For the reasons set forth in claim 1, we conclude that Ariosa has set forth a reasonable likelihood that claim 24 is anticipated by Kazakov (*see* Petition 43-45).

Case IPR 2012-00022
Patent 6,258,540

*Claim 25*

Claim 25 is an independent claim drawn to a method of prenatal diagnosis, but as discussed above in the claim interpretation section, that limitation is only in the preamble, and is thus a statement of intended use, and not a patentable limitation on the process (*see id.*). Thus, for the reasons set forth in claim 1, we conclude that Ariosa has set forth a reasonable likelihood that claim 25 is anticipated by Kazakov (*see id.*).

We conclude that Ariosa has demonstrated that there is a reasonable likelihood that claims 1, 2, 4, 5, 19, 20, 24, and 25 are anticipated under 35 U.S.C. § 102(b) by Kazakov.

IV.    Claims 1, 2, 4, 8, 21, 22, 24, and 25 rendered obvious by the combination of Simpson, Schallhammer, and Kazakov

The teachings of Simpson are discussed above in regard to the combination of Lo and Simpson. In addition, Simpson teaches that fetal cells may be recovered from maternal blood (Simpson 1229, second col.). According to Simpson, Lo demonstrated that "fetal cells, or at least fetal DNA, indeed existed in maternal blood" (*id.* at 1230, first col.). Simpson teaches that to achieve the sensitivity required in making that demonstration was achieved by using nested PCR to amplify for Y sequences, and women that were carrying a male fetus were more likely to show a Y-chromosome specific signal (*id.* at 1230, paragraph bridging the cols.). The sample used was unsorted nucleated cells (*id.*).

Schallhammer looked at the difference between natural killer cells from peripheral blood from early pregnancy decidua (Schallhammer, Abstract).

The teachings of Kazakov are discussed above.

29

Case IPR 2012-00022
Patent 6,258,540

*Claim 1*

As to claim 1, Ariosa notes that Simpson teaches that fetal cells, or at least fetal DNA, existed in maternal blood (petition 49). Ariosa relies on Schallhammer as evidence that any fetal cells that may be circulating in maternal blood would be recognized as foreign and destroyed (*id.* at 49-50 (citing Mansfield Decl., ¶¶ 85, 88, 89, and 90)). Ariosa notes further that Kazakov teaches the level of extracellular DNA increases in serum of women during pregnancy. Thus, based on those teachings, Ariosa argues that one would have expected to find fetal DNA in the serum or plasma of a pregnant female (Petition 49-50).

As to the amplification step, Ariosa relies on Simpson for teaching that PCR was used to amplify Y sequences, as well as to identify RhD status, and to identify Mendelian traits (*id.* at 50). Ariosa also notes that Kazakov also used PCR to amplify extracellular DNA (*id.*).

As to the detection step, Ariosa notes that Simpson detected Y sequences, and Kazakov detected extracellular Alu repeats.

Isis argues that Doctors Lo and Waincoat "will also be able to swear behind Schallhammer, if needed" (Response 32-33; *see also id.* at 45). However, such a declaration has not been made of record in the instant proceedings, and we cannot consider the merits of such a declaration until it is made of record.

Isis also argues that Ariosa did not address the requirement of a "reasonable expectation of success," and thus the challenge must fail on that point alone (Response 46). Isis also asserts that there was no reasonable expectation of success, as it was known that the fetal cells were rare in maternal blood, with a 1,000,000 to 100,000,000 fold difference of maternal cells to fetal cells (*id.* (citing Ex. 1011 at 850, p. 2, ¶3; Ex. 1025 at 1234-1236)). Given that difference, Isis asserts that the expected ratio of cell-free fetal DNA to cell-free maternal DNA

Case IPR 2012-00022
Patent 6,258,540

would also be expected to be very small, and thus "[a] researcher in noninvasive fetal diagnosis thus would not have had a reasonable expectation that the cell-free fetal DNA that Kazakov speculated *might* be present in maternal blood –would be abundant enough relative to maternal DNA to successfully be detected using one of Simpson 1994's methods" (Response 47).

Isis asserts further that the prior art, such as the Simpson and the prenatal diagnostic art, taught away from the combination of Simpson and Kazakov (Response 47). Isis argues that Kazakov speculated that the cell-free DNA may be from fetal trophoblasts, but Simpson described the difficulties encountered in attempting to recover trophoblasts from maternal blood (*id.*). Isis also cites Sargent as teaching that most pregnant women do not have trophoblasts in their peripheral circulation (*id.* (citing Sargent, Ex. 2038)).

We conclude that the challenge of claim 1 set forth by Ariosa set forth a reasonable expectation of success at arriving at the claimed invention. Simpson acknowledges that there is possibility that fetal DNA exists in maternal blood (Simpson 1230, col. 1). In addition, Kazakov teaches that full-size Alu repeats were found in the serum of pregnant women in their first trimester (Kazakov, Abstract). Thus, the combination of Simpson and Kazakov provides a reasonable expectation that fetal DNA could be found in the serum or plasma of pregnant women. In addition, Simpson suggests that the DNA would be found in levels sufficient to be determined using amplification reactions, such as PCR, by teaching that Y specific signals were seen in women carrying a male fetus (Simpson 1230, bridging ¶). Note that all that is required is a reasonable expectation of success, not absolute predictability of success. *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988).

Case IPR 2012-00022
Patent 6,258,540

We thus conclude that Ariosa has set forth a reasonable likelihood that claim 1 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claim 2*

Claim 2 specifies that the fetal nucleic acid is amplified by PCR. As explained above, both Simpson and Kazakov teach the use of PCR. Thus, Ariosa has set forth a reasonable likelihood that claim 2 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claim 4*

Claim 4 specifies that the fetal nucleic acid is "detected by means of a sequence specific probe." Ariosa notes that Simpson teaches the use of PCR to amplify Y specific sequences (Petition 51). Thus, Ariosa has set forth a reasonable likelihood that claim 4 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claim 5*

Claim 5 specifies that that the "presence of a foetal nucleic acid from the Y chromosome is detected." As discussed above with respect to claim 4, Simpson teaches the use of PCR to amplify Y specific sequences (*id.*). Thus, Ariosa has set forth a reasonable likelihood that claim 5 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

Case IPR 2012-00022
Patent 6,258,540

*Claim 8*

Claim 8 requires that "the presence of a paternally inherited non-Y chromosome is detected." Ariosa notes Simpson teaches that single gene traits, such as hemoglobin Lepore$_{Boston}$, which is on chromosome 11, may be inherited from the father, and can be identified by PCR using probes specific for the hemoglobin allele (*id.*). Thus, Ariosa has set forth a reasonable likelihood that claim 8 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claims 19 and 20*

Claim 19 adds the limitation that the sample contains fetal DNA "at a fractional concentration of total DNA of at least about 0.14%, without subjecting it to a foetal DNA enrichment step." Claim 20 further limits claim 19 to a fractional fetal DNA concentration of 0.39%.

Ariosa asserts that the recited concentrations are inherent properties of maternal blood composition (*id.*). We agree, and thus conclude that the limitations of claims 19 and 20 would have been inherent to the samples used by the Simpson and Kazakov references.

*Claim 21*

Claim 21 is an independent claim drawn to a method of performing a prenatal diagnosis, wherein the last step of the claim is drawn to "providing a diagnosis based on the presence and/or quantity and/or sequence of the foetal nucleic acid." In addition, claim 21 requires the steps of providing a maternal blood sample, separating it into a cellular and non-cellular fraction, and detecting the presence of a nucleic acid of fetal origin according to the method of claim 1.

Case IPR 2012-00022
Patent 6,258,540

As noted by Ariosa, Simpson describes the diagnosis of numerous pathologies in the fetus (*id.* at 51-52). Thus, Ariosa has set forth a reasonable likelihood that claim 21 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claim 22*

Claim 22 is dependent on claim 21, and adds the limitation that the non-cellular fraction is a plasma fraction. As previously discussed, Kazakov teaches obtaining fetal DNA from maternal serum (*see id.* at 52). Thus, Ariosa has set forth a reasonable likelihood that claim 22 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

*Claim 24*

Claim 24 is an independent claim, and requires the steps of "removing all or substantially all nucleated and anucleated cell populations from the blood sample," and "amplifying a paternally inherited nucleic acid from the remaining fluid and subjecting the amplified nucleic acid to a test for the Paternally inherited fetal nucleic acid." For the reasons set forth in claim 1, we conclude that Ariosa has set forth a reasonable likelihood that claim 24 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov (*see* Petition 49-51).

*Claim 25*

As to independent claim 25, as already discussed above as to claim 1, Lo teaches the steps of "obtaining a non-cellular fraction of the blood sample," "amplifying a paternally inherited nucleic acid from the non-cellular fraction," and

Case IPR 2012-00022
Patent 6,258,540

"performing nucleic acid analysis on the amplified nucleic acid to detect paternally inherited fetal nucleic acid."

Thus, for the reasons set forth in claim 1, we conclude that Ariosa has set forth a reasonable likelihood that claim 25 is rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

We conclude that Ariosa has demonstrated that there is a reasonable likelihood that claims 1, 2, 4, 5, 8, 19-22, 24, and 25 are rendered obvious by the combination of Simpson, Schallhammer, and Kazakov.

V.      Claims 1, 2, 4, 8, 19-22, 24, and 25 rendered obvious by the combination of Gocke, Robbins, and Simpson.

Gocke is drawn to "methods for detecting specific extracellular nucleic acid in plasma or serum fractions of human or animal blood associated with neoplastic or proliferative disease" (Gocke col. 1, ll. 18-21).  Specifically, Gocke teaches methods "methods for extracting, amplifying and detecting extracellular DNA associated with a neoplastic or proliferative disease state in an animal or a human and that are used for the detection, monitoring, or evaluation of cancer or premalignant conditions" (*id.* at col. 4, ll. 23-7).  Gocke teaches the use of tumor-derived or associated DNA, such as primers for K-ras (*id.* at col. 15, ll. 15-47).

Robbins, a pathology textbook, teaches that choriocarcinoma is of placental origin, and is an example of extraembryonic differentiation of malignant germ cells (Robbins, p. 1075, col. 1).

Simpson is described above.

Case IPR 2012-00022
Patent 6,258,540

According to Ariosa, "the Gocke method as applied to a pregnant female with choriocarcinoma would detect and amplify both paternally and maternally DNA of fetal origin and would thus fall within the claims at issue (Petition 53 (emphasis removed) (citing the Vasioukhin Decl. ¶¶ 118 and 119; Mansfield Decl. ¶78)).

Isis argues that Ariosa does not identify a reason to combine the references, other than to state that "that Gocke's method *could be* performed on a pregnant woman with choriocarcinoma" (Response 50). According to Isis, choriocarcinoma is diagnosed after pregnancy (*id.* at 50-51 (citing Ex. 2039, p. 355, col. 1, ¶2). Isis further notes that "[n]either Gocke nor Robbins discloses that choriocarcinoma can be diagnosed or screened for using DNA detection" (*id.* at 50 fn. 26).

We agree with Patent Owner that Ariosa has not established a reasonable likelihood that claims 1, 2, 4, 8, 19-22, 24, and 25 are rendered obvious by the combination of Gocke, Robbins, and Simpson.

First, while Ariosa asserts that if the method of Gocke were performed on a pregnant female with choriocarcinoma, it would meet the limitations of claim 1, Ariosa has not established that choriocarcinoma is associated with pregnancy itself. In that regard, we note that Fisher, cited by Isis, teaches that "choriocarcinoma can follow any type of pregnancy" (Ex. 2039, p. 355, col. 1, ¶2), and thus Isis presents evidence that choriocarcinoma usually follows pregnancy.

Second, Gocke makes clear that a primer specific for the tumor is required for the method. But Ariosa does not point to any teaching in any of Gocke, Robbins, and Simpson of a primer that would be able to distinguish choriocarcinoma nucleic acid from other nucleic acid markers that may be found in the plasma or serum of the pregnant female.

Case IPR 2012-00022
Patent 6,258,540

*Secondary Considerations*

Isis asserts in response to the obviousness rejections that Isis has significant objective evidence of nonobviousness (Response 53).  Note, that as Isis does not argue secondary considerations as to any particular claim, we will not attempt to ascertain on this record which arguments as to secondary considerations correspond to which claims.  Moreover, Isis has failed to show that the evidence of secondary considerations arises from the claimed and novel features.  *See, e.g., Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).

ORDER

ORDERED that the Petition is granted as to:

I.    Claims 1, 2, 4, 5, 19-22, 24, and 25 as being anticipated under 35 U.S.C. § 102(a) by Lo;

II.   Claim 8 as being obvious over the combination of Lo and Simpson;

III.  Claims 1, 2, 4, 5, 19, 20, 24, and 25 as being anticipated under 35 U.S.C. § 102(b) by Kazakov; and

IV.   Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 as being obvious over the combination of Simpson, Schallhammer, and Kazakov (Petition 49).

FURTHER ORDERD that the Petition is denied as to

V.    Claims 8, 21, and 22 as being anticipated under 35 U.S.C. § 102(b) by Kazakov; and

VI.   Claims 1, 2, 4, 5, 8, 19-22, 24, and 25 as being obvious over the combination of Gocke, Robbins, and Simpson.

Case IPR 2012-00022
Patent 6,258,540

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), inter partes review of the '540 patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

FURTHER ORDERED that the trial is limited to the grounds I-IV identified above and no other grounds are authorized.

FURTHER ORDERED that an initial conference call with the Board is scheduled for **2 PM ET on April 18, 2013**.  The parties are directed to the Office Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

Petitioner:
Greg Gardella
Scott McKeown
Oblon Spivak
ccunningham@oblon.com
smckeown@oblon.com

Patent Owner:
Eldora Ellision
Helene Carlson
Sterne, Kessler, Goldstein & Fox P.L.L.C.
eellison@skgf.com
hcarlson@skgf.com